988 A.2d 530

**Howard N. BIERMAN, et al.**

v.

**Gary S. HUNTER, et al.**

**No. 1362, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Feb. 1, 2010.

Charles S. Hirsch (Ballard, Spahr, Andrews & Ingersoll, LLP on the brief), Baltimore, for appellant.

ProSe/no brief filed.

Panel: MEREDITH, WOODWARD, MOYLAN, and CHARLES E., JR., (Retired, Specially Assigned), JJ.

WOODWARD, J.

The present dispute arises out of a foreclosure sale of residential real estate co-owned by Maria Hunter ("Maria"), appellee, and her husband, Gary S. Hunter ("Gary"), located at 719 Reservoir Street, Baltimore, Maryland ("the property"). On October 20, 2006, appellants, Howard N. Bierman, Jacob Geesing, Carey M. Ward, and Ralph DiPietro, substitute trustees on behalf of Countrywide Mortgage, initiated a foreclosure action by an Order to Docket suit. After the foreclosure sale, Maria filed exceptions raising the defense of fraud. A hearing was held on June 4, 2007, after which the Circuit Court for Baltimore City (Pierson, J.) sustained the exceptions and set aside the sale. Appellants then filed a Motion to Alter or Amend And/Or Revise Judgment, stating that the court failed to address appellants' equitable subrogation argument at the June 4 hearing. A hearing on the issue of equitable subrogation was held on December 21, 2007. In an order dated July 22, 2008, the circuit court ordered that the proper-

ty was "subjected to an equitable lien in the amount of $170,284.30 in favor of" appellants.

On appeal, appellants present two questions for our review, which we have rephrased:

 I. Did the circuit court err in sustaining Maria's exceptions to the foreclosure sale of the property?

 II. Did the circuit court err in not subjecting the property to an equitable lien in the full amount sought by appellants?

For the reasons set forth herein, we shall affirm the judgment of the circuit court.

## BACKGROUND

### Exceptions to Foreclosure

Maria and Gary were married when they purchased the property in September of 2002, but Maria filed for divorce in January of 2006. Maria continues to reside at the property with their three minor children, and Gary, having moved out of the property on February 1, 2006, currently lives in Brazil.

Gary refinanced the property in June of 2003 and again in January of 2004 by obtaining Maria's signature on the refinance deeds of trusts. Maria testified that the signatures on the refinance deeds of trust were hers. On January 29, 2005, Gary took out a home equity line of credit on the property with Irwin Home Equity Corporation ("Irwin Home Equity loan") in both his and Maria's names for $70,000.00. Although Maria's signature appeared on the credit line deed of trust, Maria testified that the signature on that deed of trust "[d]efinitely" was not hers.

On April 20, 2006, several months after Maria and Gary had separated, Gary executed an application for a cash-out debt consolidation loan on the property ("consolidation loan") in the amount of $320,00.00, of which $170,284.30 was to be used to pay off the pre-existing deed of trust to BB & T Mortgage and $77,356.56 to pay off of the Irwin Home Equity loan. On May 22, 2006, Gary's son (by a previous marriage) completed the

transaction, which included executing a deed of trust securing the consolidation loan under the authority of two Specific Powers of Attorney, one signed by Gary and the other purportedly signed by Maria. A joint check for $30,286.73 was issued to Maria and Gary upon closing on the consolidation loan.

Maria testified that she received "no money at all" from the consolidation loan, and that she first learned about that loan on June 24, 2006, when she received copies of the settlement papers. This was also the first time she learned about the Irwin Home Equity loan. Maria further testified that she did not sign the Specific Power of Attorney giving Gary's son authority to execute the deed of trust for the consolidation loan, and thus her signature was forged. Upon receiving the settlement papers for the consolidation loan, Maria contacted her attorney as well as the mortgage company. Soon after the settlement on the consolidation loan, Gary stopped making the loan payments.

In September of 2006, after a *pendente lite* hearing in Maria and Gary's divorce case, the circuit court ordered, *inter alia,* that, "effective July 1, 2006[,] [Gary] shall pay the monthly mortgage, escrow and late fees, if any, due" on the consolidation loan. Gary, however, failed to make any payment on the consolidation loan, and appellants instituted a foreclosure proceeding by an Order to Docket suit filed on October 20, 2006. Maria was given notice of the foreclosure sale on October 27, 2006. The sale was held, and a report of sale was filed with the court on November 22, 2006.

Thereafter, Maria filed timely exceptions to the foreclosure sale arguing, *inter alia,* that the court should "deny [appellants'] request to ratify the Report of Sale," because the consolidation loan was the product of a fraudulent transaction. Appellants filed an opposition to Maria's exceptions asserting that Maryland Rule 14–209 required Maria to raise her claim in a request for injunctive relief prior to the foreclosure sale and that "under any circumstances, [appellants were] entitled

to a lien for the amount used to pay off the deeds of trust ($247,640.86) by virtue of equitable subrogation."

A hearing was held on June 4, 2007. In a Memorandum and Order dated August 15, 2007, the circuit court "found, based on the uncontroverted evidence produced at the hearing, that [Maria] did not in fact sign the special power of attorney." The court also ruled that Maria was "not barred from raising her defense to the foreclosure by reason of her failure to apply for an injunction before the sale." Accordingly, the court sustained Maria's exceptions and set aside the foreclosure sale of the property.

## Equitable Subrogation

The circuit court, however, did not rule on appellants' request for equitable subrogation. As a result, on October 18, 2007, appellants filed a Motion to Alter or Amend And/Or Revise Judgment[1] requesting that the court "modify its Memorandum and Order to establish an equitable mortgage on the [p]roperty ... in favor of [appellants] in the amount of the mortgage paid by the refinancing at issue," which included the BB & T mortgage ($170,284.30), the Irwin Home Equity loan ($77,356.56), and the "equity paid to [Gary] and [Maria] at the time of the closing [ ($30,286.73) ]." In total, appellants requested equitable subrogation in the amount of $277,927.59.

The circuit court held a hearing on appellants' motion to alter or amend on December 21, 2007. Although Maria did not file an opposition to the motion, she represented to the court during the hearing that she opposed only the amount of equitable subrogation being sought. The court did not rule on the motion, but instead stated:

[T]he Rules require that any party who opposes a motion file an opposition. I direct that [Maria] supply to me, file

---

1. The circuit court signed the Memorandum and Order on August 15, 2007. Thereafter, the court was advised of an error in the description of the property and modified the Memorandum and Order on October 3, 2007, which were entered on October 10, 2007. Accordingly, appellants' Motion to Alter or Amend And/Or Revise Judgment was timely filed on October 18, 2007.

with the Clerk and supply a courtesy copy to chambers, of any opposition that you have to this motion not later than next Friday, that is December 28, 2007.

* * *

... [Appellants], I will give you one week that is until January 4, to file a reply. At that time I will determine whether a hearing is necessary upon the Motion to Alter or Amend or whether I can decide it based upon the papers.

Maria mailed an opposition to appellants' motion to alter or amend on December 28, 2007, which was received by the court on December 31, 2007. In her opposition, Maria argued that equitable subrogation should apply to the BB & T Mortgage in the amount of $170,284.30, but not to the Irwin Home Equity loan or the check to her and Gary from the consolidation loan. In particular, Maria contended that "she did not apply for the $77,356.56 line of credit with Irwin Home Equity that was taken out on the property on January 29, 2005 and she was not aware of its existence until June 2006." Maria also disputed ever receiving "any benefit from the line of credit after it was issued," or "any of the proceeds from the $30,286.73 joint check that was issued to [Gary and Maria] at the time of closing" on the consolidation loan.

On January 4, 2008, appellants responded to Maria's opposition, arguing, among other things, that Maria clearly received a benefit from the Irwin Home Equity loan, because it was made on January 29, 2005, a year before Maria separated from Gary and filed for divorce, and Gary paid all of the bills out of their joint bank account until shortly after the settlement on the consolidation loan in May of 2006. Appellants also claimed that Maria received the benefit of the Irwin Home Equity loan by continuing to reside in the property and to receive $475.00 per month from the rental of an apartment in the property.

Appellants argued that equity demanded that a lien be imposed on the property for the amount of the closing check, $30,386.73, explaining that Maria benefitted from the check,

because the circuit court in the divorce action "expressly relied upon" the "fact that [Gary] profited from refinancing the [p]roperty," when fashioning Maria's award of child support, alimony, personal property, and attorneys' fees.

The court resolved the issue of equitable subrogation in a Memorandum and Order issued on July 22, 2008. The court first cited to the following principle of law: "[O]ne who lends money upon the security of a mortgage that is in fact ineffective because the person executing it had no authority to do so is entitled to be subrogated to the rights of the mortgagee under a prior valid mortgage discharged with the proceeds of the invalid one." Accordingly, the court ruled that appellants were entitled to equitable subrogation "with respect to the BB & T deed of trust."

Turning to the closing check, the court found that

the subrogation does not extend to the $30,286.73. First, because these funds are not the subject of a prior lien, there is no lien to which [appellants] can be subrogated. Second, [Maria] testified at the hearing of June 4, 2007 that she did not receive any portion of the proceeds of this check. Although the court does not credit all of her testimony, there was no contradiction of this testimony. [Appellants'] argument that [Maria] received the benefit of these funds because they were taken into account by [the divorce court] in fashioning relief in the divorce proceeding ... does not alter the court's conclusion that there is no basis to grant [appellants] a lien for this item.

With respect to the Irwin Home Equity loan, the court ruled:

The more difficult issue involves the Irwin Home Equity loan. This transaction occurred while [Gary and Maria] were still living together. The instrument contains an acknowledgment for both grantors. However, [Maria] testified that she did not sign the instrument in question. There was no contradiction of this testimony. As recited above, subrogation permits a party to accede to the rights attendant upon a "valid" mortgage. This places upon [appellants]

the burden to demonstrate that the prior lien was valid. A valid grant of an interest in real property, including a security interest, requires that the instrument be executed by the grantor. [Appellants] have not offered any evidence to contradict [Maria's] testimony that she did not execute the instrument, or any other argument to validate this instrument. Therefore, the court must conclude that [appellants] have failed to sustain their burden to demonstrate entitlement to equitable subrogation as to this portion of their claim.

Therefore, the court imposed an equitable lien in the amount of $170,284.30 in favor of appellants.

This timely appeal followed.

## *DISCUSSION*

### I.

### *Did the circuit court err in sustaining Maria's exceptions to the foreclosure sale of the property?*

Appellants contend that *Greenbriar Cond., Phase I Council of Unit Owners, Inc. v. Brooks,* 387 Md. 683, 878 A.2d 528 (2005), and *Jones v. Rosenberg,* 178 Md.App. 54, 940 A.2d 1109, *cert. denied,* 405 Md. 64, 949 A.2d 652 (2008), stand for the proposition "that exceptions filed after a foreclosure sale can only raise procedural irregularities to the sale itself, such as insufficient advertisement or notice of the sale," and that "in order to raise the type of substantive challenge asserted here by [Maria], a debtor is required to file a pre-sale injunction pursuant to [Rule] 14–209." Appellants thus conclude that, because Maria did not seek injunctive relief prior to the foreclosure sale, the court, "as a matter of law," was required to overrule Maria's exceptions. We disagree and explain.

This Court in *Jones* articulated the standard of review for exceptions to a foreclosure sale:

In ruling on exceptions to a foreclosure sale and whether to ratify the sale, trial courts may consider both questions of fact and law. In reviewing a trial court's finding of fact, we

do "not substitute our judgment for that of the lower court unless it was clearly erroneous" and give due consideration to the trial court's "opportunity to observe the demeanor of the witnesses, to judge their credibility and to pass upon the weight to be given their testimony." Questions of law decided by the trial court are subject to a *de novo* standard of review.

178 Md.App. at 68, 940 A.2d 1109 (citations omitted).

Maryland's foreclosure procedure is set forth in Title 14 of the Maryland Rules, "Sales of Property." [2] Rule 14–202(a) authorizes the lender, under power of sale or assent to decree, to initiate foreclosure on real or personal property upon default without the necessity of a prior court order. Like the instant case, "[a]n action to foreclose a lien pursuant to a power of sale shall be commenced by filing an order to docket." Rule 14–204(a). Rule 14–204(c) provides: "In an action to foreclose a lien pursuant to a power of sale ..., including a foreclosure on residential property, it is not necessary that process issue or that a hearing be held prior to sale." In other words, a foreclosure action under a power of sale does not begin with the filing of a complaint and the opportunity for the defendant to respond by answer.

The court becomes involved in a foreclosure action only after the sale is completed. Rule 14–305, entitled "Procedure following sale," provides in paragraph (a): "As soon as practicable, but not more than 30 days after a sale, the person authorized to make the sale shall file with the court a complete report of the sale and an affidavit of the fairness of the sale and the truth of the report." Upon the filing of the report of sale with the court, the clerk issues a notice with a description of the property "stating that the sale will be ratified unless cause to the contrary is shown within the 30 days after the date of the notice." Rule 14–305(c).

---

**2.** Chapter 200 of Title 14 of the Maryland rules governing foreclosures was substantially amended, effective May 1, 2009.

Within this 30 day period, a party may file exceptions to the ratification of the sale.[3] "Any matter not specifically set forth in the exceptions is waived. . . ." Rule 14–305(d)(1). After the filing of exceptions, the court then determines if a hearing is necessary, but "it may not set aside a sale without a hearing," and must hold a hearing if one is requested and the exceptions "clearly show a need to take evidence." Rule 14–305(d)(2). A court will ratify the sale if the time for filing exceptions "has expired and exceptions to the report either were not filed or were filed but overruled, and . . . the court is satisfied that the sale was fairly and properly made." Rule 14–305(e).

The historical context of exceptions to a foreclosure sale is necessary to understand its scope. Rule 14–305 is derived from former Rule BR6,[4] also entitled "Procedure Following Sale," which must be read together with former Rule W74 e, entitled "Procedure Following Sale—Report—Ratification— Audit." [5] Former Rule W74 e, and by extension former Rule BR6, supplanted Article 66, § 9 of the Maryland Code, which governed the enforcement of mortgages. *Wilson Brothers v. Cooey*, 251 Md. 350, 360, 247 A.2d 395 (1968).

In *Albert v. Hamilton*, 76 Md. 304, 25 A. 341 (1892), the Court of Appeals discussed the importance of exceptions to a foreclosure sale under Article 66, § 9:

The Court, sitting in equity, had jurisdiction of the questions arising under the proceedings to enforce the mortgage. **By the ninth section of Article 66, of the Code, it**

---

3. If notice is not issued, a party has 30 days to file exceptions after the filing of the report of sale. Rule 14–305(d)(1).

4. Former Rule BR6b provided, in pertinent part:

A final order of ratification of a sale shall be passed by the court after the time for responding to any order issued pursuant to subsection 2 of this section has expired, if the court is satisfied that the sale was fairly and properly made, and exceptions are not filed to the report of sale, or if exceptions are filed but overruled.

5. Former Rule W74e provided: "The procedure following a sale made pursuant to this Subtitle shall be as provided in Rule BR5 (Real Property—Recording) and Rule BR6 (Procedure Following Sale) of Subtitle BR (Sales—Judicial), except that an audit is mandatory."

is enacted that it should have full power to hear and determine any objections against the sale of the land which might be filed by any person interested in the property, and that it might confirm or set aside the sale; and by the eleventh section it is provided that when the sale is confirmed by the Court, it shall pass all title which the mortgagors had at the time of the recording of the mortgage. Until the sale is reported by the mortgagee all the proceedings are *ex parte;* but when the report is made, an opportunity is afforded to all parties interested to make their objections to the sale. **As the ratification of the sale will pass all the title of the mortgagors, it must follow that they have a right in objecting to the ratification, to show, if they can, that their title ought not to pass.** If this were not the case, their title would, under the terms of the Act, be taken from them without a hearing. **If the mortgage under which lands are sold is void for any cause, undoubtedly this is a most sufficient reason why the sale should not be ratified which takes away the title of the mortgagor. The statute says, that the Court "shall have full power to hear and determine any objections which may be filed against the sale;" not merely objections to the regularity of the mode in which the sale was conducted.** The object was to enable mortgagors and others to prevent the ratification of a sale which would unjustly deprive them of their property. The purpose of this legislation was to provide a more expeditious and less expensive method of enforcing mortgages than the former proceeding by formal bill in equity; but not, by any means, to impair or defeat the right of the mortgagor to be heard in defense of his property. **And in enabling him to make *any objections against a sale*, which would take away his title, the statute has preserved to him his unquestionable right to show that the mortgage was invalid, and therefore did not justify a sale of his property.**

*Id.* at 307–08, 25 A. 341 (emphasis added) (italicization in original).

*Albert,* like the instant case, dealt with allegations of a mortgage procured by "false and fraudulent representations." *Id.* at 305, 25 A. 341. In *Albert,* the appellants filed exceptions to a foreclosure sale, but did not allege therein that the mortgage was fraudulent or invalid for any other reason. *Id.* at 306, 25 A. 341. The exceptions were overruled and the sale was ratified by the circuit court. *Id.* Subsequently, the appellants "filed a bill in equity . . . in the same Court . . . in which they charged that the said mortgage was obtained by fraud." *Id.* at 305–06, 25 A. 341. Relying on Article 66, § 9, the Court of Appeals explained that the validity of the mortgage was "determined under exceptions to the ratification of the sales," and that the question of fraud "ought at that time to have been presented to the court for decision." *Id.* at 309, 25 A. 341. Accordingly, the Court held: "It is not in the power of a party to split up a subject of litigation into portions, and bring them before a Court of justice for adjudication in successive suits." *Id.* at 309, 25 A. 341.

In *Wilson Brothers,* the Court of Appeals explained that, although former Rule 74e supplanted Article 66, § 9, "the scope of the hearing ha[d] not been narrowed." 251 Md. at 360, 247 A.2d 395. In stating this, *Wilson Brothers* discussed *Albert,* and reinforced the proposition that

the equity court, . . . with "full power to hear and determine any objections which may be filed against the sale[,]" had power to hear objections not only going to the manner in which the sale was conducted, but reasons why the mortgagor's title should not pass, which would naturally include an attack on the validity of the mortgage.

*Wilson Bros.,* 251 Md. at 360, 247 A.2d 395 (emphasis added).

The rule upon which appellants base their argument, Rule 14–209(b), entitled "Injunction to stay foreclosure," is also traceable to Article 66 of the Maryland Code. The Rule was derived from former Rule W76b, also entitled "Injunction to Stay Foreclosure," which evolved from Article 66, § § 16–18. Consequently, the injunction to stay foreclosure and exceptions to sale have always co-existed as two available forms of

relief, the difference being that Rule 14–209(b) limits the court's authority to grant an injunction, stating, in relevant part:

> The motion shall not be granted unless the motion is supported by affidavit as to all facts asserted and contains: (1) a statement as to whether the moving party admits any amount of the debt to be due and payable as of the date the motion is filed, (2) if an amount is admitted, a statement that the moving party has paid the amount into court with the filing of the motion, and (3) a detailed statement of facts, showing that: (A) the debt and all interest due thereon have been fully paid, or (B) there is no default, or (C) fraud was used by the secured party, or with the secured party's knowledge, in obtaining the lien.[6]

*See also* W76b; Article 66, § 16. On the other hand, in ruling on exceptions, the court has the broad authority to determine "that the sale was fairly and properly made," *see* Rule 14–305(e); BR6b; Article 66, § 9.

In fact, the presence of these two separate forms of relief was explained by the U.S. District Court in *Fisher v. Federal National Mortgage Association*, 360 F.Supp. 207 (D.Md.1973). The court in *Fisher* stated that "[u]nder Maryland foreclosure procedures" an interested party has "two separate opportunities" to challenge "the legality of the foreclosure" in state court. *Id.* at 211.

> First, under Rule W76b, plaintiffs may move prior to sale to enjoin the foreclosure. Secondly, after the sale but before ratification, plaintiffs have the opportunity to file objections to the sale. Rules W74e and BR6b[ ]. **The equity court has full power to hear and determine all objections which may be filed against the sale.** *Wilson Bros. v. Cooey*, 251 Md. 350, 360, 247 A.2d 395 (1968). When an equity court

---

**6.** *Jones v. Rosenberg*, 178 Md.App. 54, 65–66, 940 A.2d 1109, *cert. denied*, 405 Md. 64, 949 A.2d 652 (2008) confirms the limitations Rule 14-209 places on the court to grant injunctive relief, holding that "[a]ppellants' motion did not comply with any of the [Rule 14–209] requirements, and the court did not err in failing to grant relief."

has once assumed jurisdiction, it will retain its jurisdiction in order to settle all questions which might arise out of the subject in controversy.

*Id.* (emphasis added).

 Appellant's argument in the case *sub judice* that Maria needed to file for a pre-sale injunction to raise the substantive challenge of fraud ignores the above historical context of Maryland's foreclosure rules and the cases interpreting those rules. Maria's ability to attack the validity of the deed of trust securing the consolidation loan was not limited to a motion to stay the foreclosure sale under Rule 14–209(b). *See Fisher,* 360 F.Supp. at 211. She could, and did, raise this issue as an exception to the ratification of the foreclosure sale under Rule 14–305. *See id.* As an equity court, the trial court had full power to hear and determine all objections to the foreclosure sale, "which would naturally include an attack on the validity of the mortgage." *Wilson Bros.,* 251 Md. at 360, 247 A.2d 395; *see Albert,* 76 Md. at 307–08, 25 A. 341. Accordingly, the trial court did not err in sustaining Maria's exceptions to the foreclosure sale on the ground that the deed of trust securing the consolidation loan was invalid.

Appellant's reliance on *Greenbriar* and *Jones* is misplaced. *Greenbriar* involved a foreclosure on the appellant's condominium for failure to pay monthly assessments "on fifty or more occasions, spread over five or more years." 387 Md. at 716, 878 A.2d 528 (emphasis omitted). The appellant challenged the foreclosure by filing exceptions to the sale after the sale was held, *id.* at 703, 878 A.2d 528, arguing that, "by demanding such a high payoff amount, [the condominium association] had effectively denied his right of redemption." *Id.* at 716, 878 A.2d 528. The circuit court "ultimately [ ] sustained the exceptions and apparently overturned the foreclosure sale." *Id.* at 706, 878 A.2d 528. This Court affirmed the invalidation of the foreclosure. *Id.* at 714–15, 878 A.2d 528. The Court of Appeals granted *certiorari* to address, *inter alia,* "[a]t what point [ ] the debtor [must] formally file his objections to the

holding of a foreclosure sale[.]" *Id.* at 688, 878 A.2d 528. The Court of Appeals initially stated:

> We hold that prior to the sale, the debtor may seek to enjoin the foreclosure sale from proceeding by filing a motion to enjoin as provided in Maryland Rule 14–209. Should a sale occur, however, the debtor's later filing of exceptions to the sale may challenge only procedural irregularities at the sale or the debtor may challenge the statement of indebtedness by filing exceptions to the auditor's statement of account.

*Id.*

Later on in the opinion, however, the Court of Appeals explained its holding in the context of the appellant's argument that the condominium association denied his right of redemption. Quoting *Butler v. Daum,* 245 Md. 447, 453, 226 A.2d 261 (1967), the Court said:

> "The final claim of the appellants that they had a right to redeem the property at any time prior to the ratification of the sale is also without merit inasmuch as the right of redemption was divested by the valid foreclosure sale. Although the jurisdiction of equity does not become complete until the filing of the report of sale, **nevertheless the sale in effect foreclosed the mortgage and divested the mortgagors of all right of redemption,** and unless satisfactory proof is shown before final ratification that the sale should be set aside, which was not done in this case, all rights of the mortgagors in the land are deemed to have ceased to exist as of the date of the sale."

*Greenbriar,* 387 Md. at 735, 878 A.2d 528 (emphasis in original).

The Court concluded that, once the appellant's property was sold at the foreclosure sale, his right of redemption terminated. *Id.* The Court then reasoned that the right of redemption was not the appellant's "sole means by which to halt the foreclosure sale.... He should have filed an injunction *prior* to the foreclosure sale in order to seek to halt the sale." *Id.*

at 736, 878 A.2d 528 (emphasis in original). Accordingly, the Court held that

> a debtor who seeks to forestall a foreclosure sale **by redemption** must either proffer to pay the stated outstanding debt, or must file a motion to enjoin the sale, on issues relating to tender, prior to the sale's occurrence. **When a dispute over the sum due exists, although it is conceded that some sum is due and in default, the proper procedure to stay or stop the sale itself on issues relating to tender and redemption, is a motion seeking to enjoin the sale prior to the sale. After the sale, redemption is foreclosed and the issues over sums due, or not due, are addressed at the audit stage, not the ratification stage.** A debtor may challenge irregularities in the foreclosure sale's procedure by filing post-sale exceptions at the time of ratification and seek to overturn the sale on those bases. Likewise, a debtor may challenge the statement of indebtedness as to amounts by filing exceptions to the auditor's statement of account.
>
> A creditor's refusal to accept a debtor's good faith, but insufficient, tender or a debtor's proffer of an incorrect amount does not insulate a debtor's right of redemption from the sale because injunctive relief *via* Maryland Rule 14–209 is the proper means available to a debtor prior to a foreclosure sale to bring such issues to the attention of the Circuit Court. **The foreclosure sale extinguishes the right of redemption.**

*Id.* at 746–47, 878 A.2d 528 (emphasis added). Therefore, the holding in *Greenbriar* is a narrow one, focusing on the debtor's right of redemption when there is a dispute over the sum due and it is conceded that some sum is due and in default.

*Jones* dealt with a foreclosure sale on a subprime mortgage. 178 Md.App. at 60, 940 A.2d 1109. In *Jones,* the appellees sent appellants notice "that the foreclosure action had been filed and that an auction sale of the property would occur on November 29, 2006." *Id.* at 61, 940 A.2d 1109. On November 20, 2006, the appellants filed a motion for an emergency injunction to stop the foreclosure sale and to quash service,

but did not attach a supporting affidavit. *Id.* The court never ruled on the motion and the foreclosure sale was held. *Id.* The appellees filed a report of sale with the court on December 6, 2006, and the court "issued a notice that the sale would be ratified on January 5, 2007." *Id.*

On December 21, 2006, before the ratification of the sale the appellants "filed a second motion for an emergency injunction to stop the foreclosure sale or, in the alternative, to stop the ratification of the sale." *Id.* The motion also stated exceptions to the foreclosure sale, and set forth therein numerous objections, including "lack of an opportunity to cure the default;" "lack of notice of the foreclosure sale by registered mail;" and "that appellants had filed suit against appellees in [federal court] on November 17, 2006, alleging that the deed of trust violated federal mortgage laws." *Id.* A hearing on the motion occurred on February 27, 2007, at which time the "appellants requested discovery of the original loan documents, including the original deed of trust, in order to determine whether the mortgage was usurious and improper, as well as discovery of whether appellants received actual notice of the foreclosure sale." *Id.* at 63, 940 A.2d 1109. The court "granted [the] appellees' motion to quash [the] appellants' requested discovery, overruled [the] appellants' exceptions to the foreclosure sale, ratified the sale, and ordered that the matter be referred to the court auditor for an accounting."[7] *Id.*

The appellants next filed a motion to alter or amend the judgment of ratification of the foreclosure sale pursuant to Rule 2–535, alleging fraud or irregularity in "that the foreclosure action was improper because appellees had violated the Truth In Lending Act (TILA), 15 U.S.C. § 1601, *et seq.*, and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601, *et seq.*, and that, with additional discovery,

7. Appellants' complaint in federal court regarding the alleged violations of federal mortgage laws was dismissed on February 5, 2007, 22 days prior to the hearing on appellants' motion and exceptions. *Jones,* 178 Md.App. at 61 n. 2, 940 A.2d 1109. Appellants thereafter appealed, but the United States Court of Appeals for the Fourth Circuit affirmed the dismissal on October 24, 2007. *Id.*

appellants could prove the violations." *Id.* This motion was also denied. *Id.* at 64, 940 A.2d 1109.

On appeal, this Court held that the appellants' first motion for an injunction to stop the foreclosure sale did not comply with the requirements in Rule 14–209(b), and that their second motion for an injunction "was filed after the foreclosure sale and, therefore, was untimely for purposes of halting the foreclosure sale." *Id.* at 65–66, 940 A.2d 1109. "Having failed to file a proper pre-sale injunction to the foreclosure sale under [ ] Rule 14–209(b), [the] appellants' next recourse was to file exceptions to the sale under Rule 14–305(d)." *Id.* at 68, 940 A.2d 1109.

In discussing the appellants' exceptions, we explained that "[a]fter a foreclosure sale, a debtor's right to redemption ends [and] a debtor may file exceptions challenging only procedural irregularities in the foreclosure sale under Rule 14–305(d)." *Id.* at 69, 940 A.2d 1109 (citation omitted). We then reasoned that "[t]he only challenge relating to procedural irregularities in the foreclosure sale ... was that [the] appellees failed to send notice by registered or certified mail." *Id.* Concluding that the appellants had proper notice of the sale, we held that the trial court "did not err in overruling appellants' exceptions to the foreclosure sale and ratifying the foreclosure sale." *Id.* at 70–71, 940 A.2d 1109.

Regarding the appellants' argument that they "made a showing of fraud or irregularity" in support of their motion to alter or amend, we stated that such motions are only granted upon a showing of extrinsic fraud, *i.e.,* fraud that prevents an adversarial trial. *Id.* at 72–73, 940 A.2d 1109. We held that the appellants' motion "contained no probative evidence showing extrinsic fraud," and thus affirmed the judgment of the circuit court. *Id.* at 74, 940 A.2d 1109.

Unlike the instant case, neither *Greenbriar* nor *Jones* addressed a situation where the the exception to the foreclosure sale attacked the underlying validity of the mortgage. *Greenbriar* set forth the appropriate procedure to forestall a foreclosure sale where the debtor admitted liability but disput-

ed the amount claimed by the creditor. 387 Md. at 746–47, 878 A.2d 528. In *Jones,* the appellants' complaint in federal court, which alleged that the deed of trust violated federal mortgage laws, never asserted that such alleged violations rendered the deed of trust invalid. 178 Md. at 82–83, 11 A.2d 466. Indeed, in the complaint in federal court appellants sought only monetary damages as relief for the alleged violations of federal mortgage laws. *Id.* at 79, 82–83, 11 A.2d 466. Additionally, appellants' fraud allegation, which was also based on alleged violations of federal mortgage laws, was raised in the context of a motion to alter or amend the judgment ratifying the foreclosure sale under Rule 2–535, not as an exception to the foreclosure sale. Most importantly, neither *Greenbriar* nor *Jones* referenced, and thus did not overrule or reject, the line of cases discussed above, *see Albert,* 76 Md. 304, 25 A. 341; *Wilson Bros.,* 251 Md. 350, 247 A.2d 395; *Fisher,* 360 F.Supp. 207, that permit a mortgagor to challenge the underlying validity of a mortgage by filing exceptions to foreclosure sale pursuant to Rule 14–305. Accordingly, those cases remain good law.

## II.

### *Did the circuit court err in not subjecting the property to an equitable lien in the full amount sought by appellants?*

Appellants contend that the "circuit court's failure to grant equitable subrogation with respect to the Irwin Home Equity deed of trust and the cash paid at closing was error." According to appellants, whether or not Maria signed the Irwin Home Equity loan is "legally irrelevant," because "she received the benefit of that loan." Appellants argue that the Irwin Home Equity loan was signed the year before Maria filed for divorce and that Gary used the proceeds from the loan to pay the mortgage on the property from January of 2005 until May of 2006. Appellants conclude that Maria received the benefit of residing in the property and renting out the property for income, and that "equity demands that a

lien be imposed in the amount of the Irwin Home Equity loan."

Appellants also argue that the divorce court took into consideration the benefit Gary received from refinancing the property, which included the Irwin Home Equity loan as well as the closing check, "in rendering its decision and award [to Maria] in the divorce hearing." Appellants acknowledge that the closing check is "not the subject of a prior lien to which [a]ppellants could be subrogated," but argue that a "court of equity has broad powers concerning subrogation" to prevent unjust enrichment. According to appellants, appellees "would be unjustly enriched if they were not required to repay the funds paid at closing." In sum, appellants urge this Court to reverse the decision of the circuit court and, in addition to the $170,284.30 for the BB & T loan, impose equitable subrogation in the amount of $77,356.56 for the Irwin Home Equity loan and $30,286.73 for the closing check. This we will not do.

Maryland recognizes three categories of subrogation: legal subrogation, conventional subrogation, and statutory subrogation. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 311, 936 A.2d 343 (2007). Legal subrogation is the category at issue in the instant case, and "arises by operation of law when there is a debt or obligation owed by one person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitle him to reimbursement to prevent unjust enrichment." *Id.* at 311–12, 936 A.2d 343 (internal quotations omitted). Subrogation thus involves the " 'substitution of one person to the position of another, an obligee, whose claim he has satisfied.' " *Id.* at 312, 936 A.2d 343 (quoting *G.E. Capital Mortgage Servs. v. Levenson*, 338 Md. 227, 231, 657 A.2d 1170 (1995)). The substituted person, however, *"can exercise no right not possessed by his predecessor,* and can only exercise such right under the same conditions and limitations as were binding on his predecessor." *Id.* at 313, 936 A.2d 343 (emphasis added) (internal quotations omitted). Accordingly, subrogation "requires an underlying and independent legal basis

upon which [a party] may assert its claims." *Id.* at 314, 936 A.2d 343.

Most of the Maryland case law involving equitable subrogation addresses priorities among lienholders, and thus is not applicable to the facts in the instant case.[8] We find *Serial Building, Loan & Savings Inst. v. Ehrhardt*, 95 N.J. Eq. 607, 124 A. 56 (N.J.Ch.1924), to be instructive on this issue. *Ehrhardt* involved a mortgage obtained by fraud sought to be foreclosed by the appellant. *Id.* at 56. In *Ehrhardt*, the appellees, husband and wife, secured a second mortgage on their home for $3000 that paid off a prior mortgage of $1,351.73. *Id.* The wife argued that, because "[t]he mortgage for $3,000 (the second one in point of time) was not signed by [her]" and was forged, "there should be no decree against her as to the $3,000 mortgage." *Id.* The appellant argued that it should "be subrogated to the rights it had under the prior mortgage which it canceled upon receiving the mortgage that it concede[d] to be defective." *Id.* at 57. The New Jersey Court of Chancery held:

> In the case in hand, [the wife] does not deny the validity of the prior mortgage by which she was bound. To restore the complainant to its rights under that mortgage will cause her no loss that she would not have been liable to sustain had the defective later mortgage never been made. Under no circumstances appearing in this case could she escape liability to the extent of $ 1,351.73. . . . It was she who set up the earlier mortgage in her answer and astonished the complainant by pleading a forgery in the later mortgage, and, under the replication of the complainant she has been afforded full opportunity to litigate any defense she might have been able to prove against the mortgage upon which $1,351.73 was due when the complainant paid it. The

---

8. In *G.E. Capital Mortgage Services v. Levenson*, 338 Md. 227, 237–38, 657 A.2d 1170 (1995), the Court of Appeals explained that equitable subrogation in the context of priorities among lienholders is when "one who pays the mortgage of another and takes a new mortgage as security will be subrogated to the rights of the first mortgagee as against any intervening lienholder."

[appellant] was not a volunteer, a mere intermeddler. It had a right to protect its interest in seeing that the earlier mortgage was paid off.

*Id.* at 57–58.

*Ehrhardt* thus stands for the same principle set forth by the Court of Appeals in *Hill:* a substituted person *"can exercise no right not possessed by his predecessor,* and can only exercise such right under the same conditions and limitations as were binding on his predecessor." 402 Md. at 313, 936 A.2d 343; *see also* Annot, *Remedy of Mortgage in Forged or Unauthorized Mortgage Where Proceeds Are Used to Discharge Valid Lien,* 43 A.L.R. 1393 (1926) (stating that the general standard applied by the majority of courts is that "one lending money upon the security of a mortgage in fact ineffective because the person executing it had no authority to do so, is entitled to be subrogated to the rights of the mortgagee under a prior valid mortgage discharged with the proceeds of an invalid one").

In the case *sub judice,* Maria testified at trial that the signature on the Irwin Home Equity loan was not hers and that she did not find out about the loan until June of 2006, a year after its execution. Appellants did not offer any evidence to dispute Maria's testimony. The circuit court thus found that "[t]here was no contradiction of this testimony." [9] The court then correctly concluded that appellants failed to sustain their burden of proving that the deed of trust for the Irwin Home Equity loan was a valid lien, because a "valid grant of an interest in real property, including a security

---

9. Appellants assert that whether Maria signed the deed of trust for the Irwin Home Equity loan is "legally irrelevant," because she did not object to that loan in her exceptions and thus her claim is waived. Appellants' argument is without merit for the simple reason that the trial court expressly directed Maria to respond to the equitable subrogation issue raised by appellants in their response to Maria's exceptions, thereby finding that "justice requires" a consideration of this issue, notwithstanding Maria's failure to raise it in her exceptions. *See* Md. Rule 14–305(d) (stating that "[a]ny matter not specifically set forth in the exceptions is waived unless the court finds that justice requires otherwise.").

interest, requires that the instrument be executed by the grantor." Consequently, we hold that appellants are not entitled to an equitable lien on the property for the Irwin Home Equity loan, because such loan, as an invalid lien, could not be enforced against Maria by either appellants or by the original mortgagee. *See Hill,* 402 Md. at 313, 936 A.2d 343 (stating that the substituted person "can exercise no right not possessed by his predecessor." (Internal quotations omitted)).

■ Appellants' argument regarding the closing check, in the amount of $30,286.73, does not fare any better. Appellants are not entitled to subrogation for the simple reason that the check was neither a debt nor an obligation owed by Maria that appellants paid for or discharged. The closing check was the balance of the proceeds of the consolidation loan whose deed of trust is the subject of this appeal.

■ Finally, appellants do not prevail on their equitable benefit argument, namely, that Maria received a benefit from the Irwin Home Equity loan and the closing check. Regarding the closing check, Maria testified that she did not receive any portion of the proceeds of the check. Appellants did not introduce any evidence contradicting that testimony. Nevertheless, appellants claim that Maria received a benefit from the proceeds of the check, because "the circuit court took this fact into account in rendering its decision and award in the divorce hearing." Our review of the circuit court's oral opinion in the divorce case reveals that the trial judge made no mention of proceeds of the closing check. Instead, the court referred to the "profit" Gary made on three properties and the use of his IRA account for another investment in Brazil. More importantly, this reference was made in the context of the court's discussion of the parties' respective financial status in determining an appropriate award of custody of the minor children. The court did not grant Maria a monetary award, and an award of child support is based on the parties' income, not assets. Md.Code (1984, 2006 Repl.Vol.), Fam. Law. Art.

§ 12–204.[10]

Appellants assert that Maria benefitted from the Irwin Home Equity loan because that loan was made about one year prior to Maria and Gary's separation, and prior to the separation, Maria and Gary "maintained a joint checking account and that [Gary] paid all the bills, including the mortgage." Appellants apparently are arguing that the proceeds of the Irwin Home Equity loan were placed in Gary and Maria's joint account, from which the mortgage payments were made. Appellants, however, adduced no evidence regarding the use of the proceeds of the Irwin Home Equity loan. There is nothing in the record to indicate what amounts were withdrawn on the loan, when they were withdrawn, where the money was placed, and how the money was ultimately spent. To say that the proceeds of the Irwin Home Equity loan were used to make the mortgage payments on the property is pure speculation.

Appellants also contend that Maria benefited from the Irwin Home Equity loan by continuing to reside in the property and collecting rent from a tenant who leased a part of the property. This argument begs the question. Maria's continued residence in the property and exercise of her ownership rights over the property could have been a benefit of the Irwin Home Equity loan only if the proceeds of the loan, which were not used to purchase the property, were used at her direction, on her behalf, or to her benefit. There was no such evidence.

Lastly, appellants contend that Maria benefitted from the Irwin Home Equity loan because that loan was considered by the circuit court in Maria and Gary's divorce proceeding. A review of the record again reveals no specific reference to the Irwin Home Equity loan. Indeed, in their reply to Maria's opposition to appellants' motion to alter or amend the trial court's ruling on the equitable subrogation issue, appellants state unequivocally that "[t]here was no mention of the Irwin

---

10. The circuit court also awarded Maria rehabilitative alimony of $1,000 per month for five years. In making that award, however, the court did not mention the proceeds of the closing check.

Home Equity loan during the Divorce Hearing." Appellants explained further in a footnote: "The undersigned did not have time to obtain a written transcript of the Divorce Hearing, but did obtain a copy of the Court's recording of the Divorce Hearing. *There was no evidence or argument concerning the Irwin Home Equity loan.*" (Emphasis added).

For all of the reasons discussed above, we hold that the circuit court did not err in finding that appellants were not entitled to equitable subrogation as to the Irwin Home Equity loan or to the closing check.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; APPELLANTS TO PAY COSTS.**