48 A.3d 276

**Darnella THOMAS, et vir.,**

v.

**Jefrey NADEL, et al.**

**No. 106, Sept. Term, 2011.**

Court of Appeals of Maryland.

June 25, 2012.

Reconsideration Denied Aug. 16, 2012.

Gerard P. Uehlinger, Towson, MD, for Appellants.

Bizhan Beiramee (Matthew D. Cohen of Beiramee & Cohen, P.C., McLean, Virginia; Scott Nadel and Jeffrey Nadel of Law Offices of Jeffrey Nadel, Calverton, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

McDONALD, J.

In the recent decision in *Bates v. Cohn,* this Court reiterated that a borrower challenging a foreclosure action must ordinarily assert known and ripe defenses to the conduct of the foreclosure sale in advance of the sale.[1] After the sale, the

---

1. *Bates v. Cohn,* 417 Md. 309, 9 A.3d 846 (2010).

borrower is ordinarily limited to raising procedural irregularities in the conduct of the sale, although the Court left open the possibility that a borrower could assert a post-sale exception that the deed of trust was itself the product of fraud.[2]

This case arises out of the foreclosure of the deed of trust for the residence of Darnella Thomas and Charles Howard Thomas, Jr. ("the Thomases") by Jeffrey Nadel and others, collectively the substitute trustees ("the Trustees").[3] In apparent hope of fitting their post-sale exceptions within the question left open in *Bates*, the Thomases allege certain defects in the chain of title of the note evidencing their debt and characterize them as a "fraud on the judicial system." For the reasons explained below, we hold that the alleged defects do not establish that their deed of trust was the product of fraud. Accordingly, we affirm the judgment of the circuit court denying their exceptions.

## Challenging a Foreclosure Sale

A borrower's ability to challenge a foreclosure sale is in part determined by whether relief is requested before or after the sale. Prior to the sale, a borrower may file a motion to stay the sale and dismiss the foreclosure action under Maryland Rule 14–211. After holding a hearing on the merits of such a motion, the court may dismiss the foreclosure action if it finds "that the lien or the lien instrument is invalid or that the plaintiff has no right to foreclose in the pending action." Maryland Rule 14–211(e).[4]

---

**2.** 417 Md. at 324 n. 10, 9 A.3d 846.

**3.** Under the deed of trust for the Thomases' home, which secures the promissory note they executed in the refinancing transaction, the property is held in trust by a trustee, though the Thomases occupy the property. The lender is permitted to remove the trustee and appoint a successor. The appellees in this case are successor trustees.

**4.** That rule states, in pertinent part:
(e) Final determination. After the hearing on the merits, if the court finds that the moving party has established that the lien or the lien instrument is invalid or that the plaintiff has no right to foreclose in the pending action, it shall grant the motion and, unless it finds good

The situation is different after a foreclosure sale. Following a sale, the clerk is to publish a notice identifying the property and stating that the sale will be ratified unless "cause to the contrary" is shown within 30 days of the date of the notice. Maryland Rule 14–305(c). During that period, a borrower may file written exceptions that describe any alleged "irregularity with particularity." Maryland Rule 14–305(d). The rule further provides that the court is to ratify the sale if (1) no exceptions are filed within the 30–day period or any that were made have been overruled and (2) the court is satisfied that "the sale was fairly and properly made." Maryland Rule 14–305(e). If the court does not find that the sale was "fairly and properly made", it may issue an "appropriate" order. Maryland Rule 14–305(e).

In 2005, this Court explained the practical difference between a pre-sale and a post-sale challenge:

> [P]rior to the sale, the debtor may seek to enjoin the foreclosure sale from proceeding by filing a motion to enjoin as provided in [the Maryland Rules]. Should a sale occur, however, the debtor's later filing of exceptions to the sale may challenge only procedural irregularities at the sale or the debtor may challenge the statement of indebtedness by filing exceptions to the auditor's statement of account.

*Greenbriar Condo. v. Brooks*, 387 Md. 683, 688, 878 A.2d 528 (2005).[5]

In a subsequent case, the Court of Special Appeals read *Greenbriar* narrowly to allow a post-sale exception that at-

---

cause to the contrary, dismiss the foreclosure action. If the court finds otherwise, it shall deny the motion.

**5.** At the time of the *Greenbriar* decision, a pre-sale challenge to a foreclosure was made by filing a motion to enjoin the foreclosure under the then-current version of Maryland Rule 14–209. The rules concerning pre-sale procedures have been amended in the interim. *See 160th Report of the Standing Committee on Rules of Practice and Procedure* (December 3, 2008), 35:26 Md. Reg. 2222. Currently, as indicated in the text, a pre-sale challenge would be made by means of a motion to stay the sale and dismiss the foreclosure action under Maryland Rule 14–211.

tacked the validity of the underlying lien. *Bierman v. Hunter*, 190 Md.App. 250, 988 A.2d 530 (2010). In *Bierman,* one of the borrowers alleged in a post-sale exception that her signature had been forged on the original note and deed of trust. 190 Md.App. at 254, 988 A.2d 530. The Circuit Court found her testimony to that effect to be "uncontroverted" and set aside the foreclosure sale. *Id.* at 255, 988 A.2d 530. The Court of Special Appeals upheld that decision despite the timing of the exception, reasoning that a circuit court exercises broad equitable powers in a foreclosure action. *Id.* at 269, 988 A.2d 530. It distinguished *Greenbriar* as involving a situation in which there was no question as to the existence of a debt, but merely a dispute as to its amount. *Id.* at 266, 268–69, 988 A.2d 530.

More recently, this Court affirmed the general application of the distinction between pre-sale and post-sale exceptions made in *Greenbriar,* reiterating that "a homeowner/borrower ordinarily must assert known and ripe defenses to the conduct of a foreclosure sale prior to the sale, rather than in post-sale exceptions." *Bates v. Cohn,* 417 Md. 309, 328, 9 A.3d 846 (2010). In *Bates,* the Court rejected the rationale of *Bierman* that Maryland courts sitting in equity have "broad authority" and "full power under Rule 14–305(e) to hear and determine all objections to the foreclosure sale." *Id.* at 324, 9 A.3d 846. Rather, the adoption of Maryland Rule 14–305 not only created a new structure for the previously existing system of post-sale inquiries, but it also limited the permissible scope of post-sale exceptions to "irregularities." *Id.* at 326–27 & n. 12, 9 A.3d 846. The Court looked to the minutes of the Rules Committee for confirmation that exceptions to a foreclosure sale under that rule are to relate to the validity of the sale itself. *Id.*

The Court in *Bates* thus expressly rejected the narrow reading of *Greenbriar* in *Bierman,* although it left open the question whether a post-sale exception might be based on fraud infecting the underlying debt, as was the case with the forgery in *Bierman. Bates,* 417 Md. at 327–28, 9 A.3d 846 ("We do not rule here on whether a homeowner may raise

under 14–305, as a post-sale exception, allegations that a deed of trust was the product of fraud, and, therefore, the sale was invalid and incapable of passing title"). The Court elaborated in a footnote:

[A]n allegation of fraud, with respect to the procedure of the sale, may be asserted properly in a post-sale exception. *Whether an allegation of fraud regarding the underlying mortgage or deed of trust likewise may be raised post-sale, however, is a related, but distinct question. . . .* [W]e have not yet addressed such a question under the more restrictive version of Rule 14–305.

417 Md. at 324 n. 10, 9 A.3d 846 (emphasis added; citations omitted).

### The Thomases' Deed of Trust and its Foreclosure

*Refinancing Transaction—Promissory Note and Deed of Trust*

On September 29, 2006, the Thomases refinanced their home in Carroll County. As part of that transaction, they signed a promissory note secured by a deed of trust against their home.[6] The original lender was Corestar Financial Group LLC ("Corestar"). Corestar subsequently indorsed the note over to Option One Mortgage Corporation ("Option One"). Option One went out of business on April 30, 2008. According to counsel for the Trustees, as one of its final acts Option One indorsed in blank the notes it held so that they could be transferred in wrapping up the business.[7]

The original note later came to be in the possession of Biltmore Specialty Investments II, LLC ("Biltmore"). The

---

**6.** A promissory note is a negotiable instrument as defined in Maryland Code, Commercial Law Article ("CL"), § 3–104. A deed of trust is a deed transferring property to a trustee to hold as security to ensure the performance of the note. For most purposes, a deed of trust is the same as a mortgage. Maryland Code, Real Property Article ("RP"), § 7–101.

**7.** An indorsement made in blank—i.e., that does not identify a person to whom the instrument is payable—is payable to bearer and may be negotiated by transfer of possession alone. CL § 3–205.

evidence presented at the hearing before the Circuit Court suggested that Biltmore did not come into existence until 2009. No evidence was presented explaining the chain of title from Option One to Biltmore, and no intermediary holders were identified. Biltmore did produce an allonge to the note signed by an assistant secretary of Option One and an assignment of the deed of trust from Option One signed by a different assistant secretary.[8] Biltmore's name was handwritten onto both the allonge and the assignment in the spaces provided.[9]

*Foreclosure of Deed of Trust*

The Thomases stopped making mortgage payments in May 2008. On September 14, 2009, the Trustees sent a notice of intent to foreclose to the Thomases. On November 12, 2009, the Trustees initiated a foreclosure action by filing an Order to Docket in the Circuit Court for Carroll County. The Thomases were able to postpone the foreclosure proceedings in the Circuit Court for approximately one year prior to the foreclosure sale, during which time they did not contest Biltmore's ownership of the underlying debt.[10] The foreclosure sale of the Thomases' home occurred at public auction on November 12, 2010. Biltmore was the winning bidder.

---

**8.** An allonge is a slip of paper attached to a negotiable instrument for the purpose of receiving indorsements to the instrument. BLACK's LAW DICTIONARY 88 (9th ed. 2009). Under CL § 3–204, for the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument. An allonge is such a paper. *See* CL § 3–204, official comment.

**9.** A blank indorsement may be converted to a "special indorsement" by writing, above the signature, words identifying the person to whom the instrument is made payable. CL § 3–205(c). When specially indorsed, an instrument becomes payable to the identified person and may be negotiated only by the indorsement of that person. CL § 3–205(a).

**10.** The Thomases filed several bankruptcy cases that stayed the foreclosure action. In at least two of those actions, Biltmore was identified as a creditor. The Thomases also obtained a short postponement on the ground that they were pursuing a loan modification program with the loan servicer.

*Post–Sale Exceptions and Hearing*

On December 7, 2010, the Thomases, in a *pro se* capacity, filed exceptions to the sale in the circuit court pursuant to Maryland Rule 14–305. The exceptions alleged three irregularities:

1. the name that appeared as the secured party on the notice of intent to foreclose was not the same as appeared on the documents transferring the note to Biltmore [11];

2. there was a gap in the chain of title from Option One to Biltmore as it was not clear who owned the note between the 2008 termination of Option One and the 2009 formation of Biltmore; and

3. the signatures on the order to docket the foreclosure action and related attestations did not match.[12]

The second of these exceptions is the basis of the present appeal.

A hearing was held on the exceptions before the Circuit Court. At the hearing, and over the objections of the Trustees, the Thomases presented expert opinion testimony from Elizabeth Jacobson, who had had significant experience in the

---

**11.** RP § 7–105.1 generally requires that a written notice of intent to foreclose be sent to the mortgagor or grantor and the record owner of the home at least 45 days prior to the filing of an action to foreclose a mortgage or deed of trust on residential property. The statute requires that the notice contain certain information including, among other things, the name of the secured party. The notice sent to the Thomases named "Biltmore Specialty Investment I LLC" instead of "Biltmore Specialty Investments II, LLC." There is no explanation for this discrepancy in the record.

**12.** There are two signatures that appear above the name Jeffrey Nadel on those documents, and they are not facially similar. One of those signatures appears above the name Jeffrey Nadel and no other name. The other signature appears above the names of both Jeffrey Nadel and Scott Nadel (also a substitute trustee in this case), and that signature is very similar to the other signatures of Scott Nadel in the record. Although not resolved in the record, it may be inferred that the second signature is the signature of Scott Nadel, above whose name it appears.

area of mortgages and foreclosure.[13] She testified that, in her opinion, Biltmore was not legally entitled to enforce the note because of issues with its chain of title. As the basis for her opinion, she pointed to the gap in time between the demise of Option One and the formation of Biltmore, the dating of the assignment of the note prior to the creation of Biltmore, and an Affidavit of Lost Assignment of Deed of Trust filed by Citicorp Global Markets Realty Corp. in the land records suggesting that it might be the legal holder of the note. At the hearing, the Trustees stated that the note had been indorsed in blank by an employee of Option One shortly before that entity went out of business, produced the original note and allonge, and proffered that the note had been subsequently indorsed to Biltmore, as permitted by the Uniform Commercial Code.[14] *See* CL § 3–205(c).

The Circuit Court denied the exceptions, finding that the alleged irregularities concerning the assignment and ownership of the note could only have been raised prior to the sale, and ratified the sale. The Thomases appealed that decision. On its own motion, this Court granted certiorari prior to review by the intermediate appellate court.

## Discussion

The Thomases' post-sale exceptions did not relate to procedural irregularities at the sale or to the statement of indebtedness. Under the general rule set forth in *Greenbriar* and *Bates,* those exceptions were untimely. On appeal, with the benefit of counsel, the Thomases urge that we qualify that

---

**13.** The record does not reflect the precise nature of the field for which she was qualified as an expert. Ms. Jacobson testified that she was certified as a "forensic loan auditor" by the National Association of Mortgage Underwriters, had nine years experience as a loan originator with Wells Fargo, and worked at Mid Shore Pro Bono as a foreclosure defense specialist.

**14.** At the hearing the Trustees did not attempt to explain the involvement of Citicorp Global Markets Realty in the chain of title. On appeal, they note that, under the Uniform Commercial Code, the Thomases may not assert a third party's claim to the instrument as a defense without joining the third party. *See* CL § 3–305(c).

general rule to allow an exception based on fraud infecting the deed of trust—as left open in *Bates*—and argue for its application to this case.[15] They rely primarily on the argument that the gaps in the chain of title of the note amount to a "fraud" on the judicial process and that their exception based on that argument was properly raised post-sale under *Bates*.[16] Unfortunately for the Thomases, the facts alleged do not amount to the kind of fraud that might induce this Court to qualify the general rule limiting the nature of post-sale exceptions.

It is true that fraud appears in many guises. "[I]t is as old as falsehood and as versable as human ingenuity."[17] But it is not simply a label that may be applied to any set of puzzling circumstances. A popular legal reference defines "fraud" as "a knowing misrepresentation of the truth or concealment of a material fact [or a misrepresentation made

---

**15.** At argument, the Thomases also urged that we expand the availability of post-sale exceptions when the buyer at the foreclosure sale is the secured party, as was the case here. That issue was not before the lower court, never briefed, and barely argued. It is not considered here.

**16.** The legal theory advanced before the Circuit Court by the Thomases in their *pro se* capacity is not entirely clear, and their exceptions were filed prior to this Court's decision in *Bates v. Cohn*. However, Mr. Thomas did use the word "fraudulent" at least one time in the record in reference to the transaction at issue and analogized their situation to *Bierman v. Hunter*, 190 Md.App. 250, 988 A.2d 530 (2010), which, as explained earlier in the text, involved fraud by way of forgery. Given the *pro se* nature of the Circuit Court proceeding and the fact that the present issue was decided by the Circuit Court, and briefed and argued by both parties in this Court, we proceed as though fraud was the original theory presented.

In an effort to bolster their argument that the alleged gaps in the chain of title demonstrate fraud, the Thomases' brief also includes correspondence from Goshen Mortgage LLC and AMS Servicing stating that the Thomases' loan was transferred to Goshen and that AMS Servicing is the new servicer. The letters are dated after the foreclosure sale and after this appeal was noted. These documents were not part of the record before the Circuit Court. In any event, while they may relate to a post-foreclosure transfer of the note, it is not clear that they are relevant to the question before this Court.

**17.** *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941).

recklessly without belief in its truth] to induce another to act to his or her detriment." BLACK'S LAW DICTIONARY 731 (9th ed. 2009). It further defines "fraud on the court": " . . . a lawyer's or party's misconduct so serious that it undermines or is intended to undermine the integrity of the proceeding. Examples are bribery of a juror and introduction of fabricated evidence." *Id.* at 732. The tort of fraud similarly is based on a knowing or reckless misrepresentation. *Maryland Environmental Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512 (2002).[18]

 Even when there is a material misrepresentation, not all frauds involving documents necessarily bear the same consequences. In the context of a fraud relating to execution of a document, Maryland courts have distinguished between cases of forgery or alteration, as well as cases where the executing party was mistaken or misled as to the very nature and effect of the document being signed, from cases where the document is properly and intentionally executed but where the execution is induced by false pretenses or deceit. *See Scotch Bonnett Realty Corp. v. Matthews,* 417 Md. 570, 575–76, 11 A.3d 801 (2011); *Harding v. Ja Laur Corp.,* 20 Md.App. 209, 315 A.2d 132 (1974). The distinction is made because there can be no bona fide holder of title under a forged deed—where there was fraud in the creation of the document itself— whereas a deed obtained by false pretenses or deceit—for example, where the grantor is misled into believing the grant-

---

**18.** The tort of fraud or deceit generally requires proof: (1) that the one perpetrating the fraud made a false representation to the victim; (2) that its falsity was either known to the perpetrator or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the victim; (4) that the victim relied on the misrepresentation and had the right to rely on it; and (5) that the victim suffered compensable injury resulting from the misrepresentation. 370 Md. at 97, 803 A.2d 512; *see also VF Corp. v. Wrexham Aviation Corp.,* 350 Md. 693, 703, 715 A.2d 188 (1998); *Le Marc's Management Corp. v. Valentin,* 349 Md. 645, 653, 709 A.2d 1222 (1998); *Alleco Inc. v. Weinberg Foundation,* 340 Md. 176, 195, 665 A.2d 1038 (1995); *Gross v. Sussex, Inc.,* 332 Md. 247, 257, 630 A.2d 1156 (1993); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 584– 85, 723 A.2d 502, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999).

ee is his long-lost brother—can transfer title to a bona fide purchaser. *Harding,* 20 Md.App. at 214–15, 315 A.2d 132.

Similarly, Maryland commercial law recognizes that the right to enforce the obligation of a party to pay an instrument is subject to a defense based on fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms. CL § 3–305(a)(1)(iii). The official comment explains:

> Subsection (a)(1)(iii) refers to "real" or "essential" fraud, sometimes called fraud in the essence or fraud in the factum, as effective against a holder in due course. The common illustration is that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that the signature on the instrument is ineffective because the signer did not intend to sign such an instrument at all. Under this provision the defense extends to an instrument signed with knowledge that it is a negotiable instrument, but without knowledge of its essential terms. The test of defense is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account, including intelligence, education, business experience, and ability to read or understand English of the signer. Also relevant is the nature of the representations that were made, whether the signer had good reason to rely on the representations or to have confidence in the person making them, the presence or absence of any third person who might read or explain the instrument to the signer, or any other possibility of obtaining independent information, and the apparent necessity, or lack of it, for acting without delay. Unless the misrepresentation meets this test, the defense is cut off by a holder in due course.

CL § 3–305, comment 1.

We need not parse further the distinctions that may be drawn among various manifestations of fraud, for the Thom-

ases alleged no facts meeting any of these definitions. Here, the genuineness of the documents presented at the hearing is not in question. The Thomases signed a note and deed of trust, and the original was produced at the hearing by the Trustees. There is no allegation that the Thomases were tricked into signing, that there was any misrepresentation, or that the signing was otherwise unlawful. There is no question that the Thomases are bound by the note and no question that they did not fulfill their obligations under it. By contrast, the note in *Bierman,* as a forgery, was fraudulent in itself and, as fabricated evidence, also qualified as a "fraud on the court." Additionally, there is no allegation that any fraud, misrepresentation, or unfairness contributed to the Thomases' failure to fulfill their loan obligations, failure to redeem the property prior to sale, or failure to raise these exceptions prior to sale.

■ The Thomases simply point to possible gaps in the chain of title—which may not be significant under the Uniform Commercial Code [19]—and suggest those asserted discrepancies suffice to establish an exception to the general rule that only irregularities in the sale itself may be the subject of post-sale exceptions. But the record reveals no genuine dispute as to the authenticity of the allonge and assignment of deed of trust, as was conceded at argument. The Trustees possessed the original documents, and the indorsing signatures are not alleged to be the products of either forgery or deceit. "It is the settled rule that [one] seeking any relief on the ground of fraud must distinctly state the particular facts and circumstances constituting the fraud and the facts so stated must be sufficient in themselves to show that the conduct complained of was fraudulent. General charges of fraud or that acts were fraudulently committed are of no avail ..." *Spangler v. Sprosty Bag Co.,* 183 Md. 166, 173, 36 A.2d 685 (1944).

---

**19.** A gap in the chain of title would not necessarily result in dismissal of a foreclosure action even if the issue was properly raised prior to the sale. *See Anderson v. Burson,* 424 Md. 232, 35 A.3d 452 (2011).

## Conclusion

The Thomases seek to bring their situation within the "distinct question" left open in *Bates*—whether fraud infecting the underlying mortgage or deed may be raised by a borrower in a post-sale exception. The definitive answer to that question must await another day. We hold in this case that a general allegation of "fraud" does not suffice.

**Judgment of the Circuit Court for Carroll County affirmed; costs to be paid by the Appellants.**