9 A.3d 846

**Sonja D. BATES**

v.

**Edward S. COHN, et al.**

**No. 28, Sept. Term, 2010.**

Court of Appeals of Maryland.

Dec. 16, 2010.

310

Vicki King Taitano (Legal Aid Bureau, Riverdale), on brief, for appellant.

Eric A. Frechtel (Marc James Ayers of Bradley Arant Boult Cummings LLP, Washington, D.C.), on brief, for appellees.

Robert H. Hillman (Magazine & Hillman, P.C., Rockville), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

Sonja D. Bates ("Appellant"), whose house was sold at foreclosure, sought, in the context of post-sale exceptions, a court-ordered "do-over" based on allegations that essentially her lender failed to allow her to take advantage of pre-sale loss mitigation efforts required by federal regulations. For reasons we shall explain, we agree with the Circuit Court for Montgomery County that Appellant, by failing to raise a ripe claim in this regard prior to the sale of her house, waived effectively that claim. Ordinarily, such a claim must be asserted before sale as a ground to stay or enjoin the proposed sale.

## I.

On the legal question upon which the Circuit Court decided this case, the trial judge was not required to engage in much fact-finding, despite hearing the testimony of two witnesses and receiving copious documentary evidence. Thus, the "facts" that we shall recite hereafter, largely for context, are an amalgam of the parties' evidence and proffers in this record. Were we not to agree with the legal ground of the trial court's ruling, a remand for further fact-finding would have been necessary.

In February 1999, Bates purchased a residence at 8706 Tryal Court, Gaithersburg, Maryland. She did so with a $148,773.00 loan extended by Appellees, GMAC Mortgage

LLC ("GMAC"), and guaranteed by the Federal Housing Administration ("FHA"). In 2002, when Bates fell behind in her mortgage payments, GMAC instituted foreclosure proceedings, but those proceedings were dismissed before sale when Bates resolved the default.

In 2007, Bates encountered renewed difficulty paying her deed of trust note.[1] Although her account with GMAC fell into (and never left) default beginning in October 2007, the lender-declared default that led to the relevant 3 June 2009 foreclosure sale occurred on 2 September 2008. At that point in time, she was $3,072.76 in arrears, according to GMAC.[2]

Between the declaration of default and notice of the foreclosure sale, GMAC and Bates were in contact on multiple occasions, beginning with the 13 October 2008 notice of default sent to her by GMAC. The notice apprized Bates, among other things, that there was an "unresolved default on [her] account." It detailed briefly four options "which may be available to help avoid a foreclosure action," attached a pamphlet entitled "How to Avoid Foreclosure," and provided telephone numbers for federal Housing and Urban Development ("HUD") counselors and GMAC loss mitigation representatives.

The next month, on 3 November 2008, GMAC sent another letter to Bates, informing her that her "mortgage loan is in default," and without full payment, it "will . . . begin foreclosure proceedings." The letter made clear, however, that she "ha[s] the right to assert or defend the non-existence of a default[,] and [she] may have other rights under state law."

---

1. Bates's record of timely mortgage and other payments, required under her deed of trust and note, had been spotty since May 2007, according to the lender. Her account on GMAC's books had not been current since 31 October 2007.

2. In the financial package of information she provided later to GMAC, in pursuit of a loan modification, Bates listed her total monthly mortgage payment (presumably principal and interest) as $1,312.02. As of 1 August 2008, Bates owed a principal amount on the loan of $126,644.54, according to the lender's records.

It again encouraged Bates to call "immediately" HUD or GMAC loan counselors.

On 26 November 2008, Bates responded by calling a GMAC representative. She stated that, although she was not employed full-time from November 2007 to April 2008, and had been working only part-time since April 2008, she was starting a new full-time job in December 2008. She inquired about a loan modification. The GMAC representative asked her to provide updated financial information and to call back when her finances improved.

Several days later, on 3 December 2008, GMAC sent another letter to Bates, reminding her that she had "failed to reinstate [her] account" and, as a result, "it may be sent to an attorney to initiate foreclosure action," after which she "will lose title to the property." The letter again provided the number for GMAC loan counselors, "if [she] wish[ed] to discuss possible alternatives...."

On 6 January 2009, GMAC referred the matter to its Maryland foreclosure counsel, Cohn, Goldberg & Deutsch, LLC ("Cohn"). The firm sent a letter, dated 7 January 2009, to Bates, explaining that "[t]he mortgage for the property in which you are living is about to be foreclosed...."

Cohn mailed a second letter, on 13 January 2009, reiterating to Bates that her mortgage loan matter had been referred to its office for legal action. Three days later, Cohn sent, by certified mail, a Notice of Intent to Foreclose, which urged Bates to "contact [a] Loss Mitigation Manager ... immediately," as "we may begin foreclosure ... [forty-five] days after this Notice is sent and [ninety] days from the default date." Before the trial court, Bates acknowledged receipt of the notice. Cohn filed an order, on 13 March 2009, to Docket Foreclosure of Residential Property, in the Circuit Court for Montgomery County.

On 1 April 2009, 125 days following her 26 November 2008 verbal response to GMAC's declaration of default, Bates phoned GMAC again. She represented to the trial court that she had not pursued more aggressively a loan modification because, according to her testimony, she was "waiting for the

new ... [federal Home Affordable Modification Program ("HAMP")] to become available...." As Bates discovered, however, HAMP proved ultimately inapplicable to her situation.[3] Bates told the GMAC representative that she remained interested in a loan modification. The representative informed her that she would have to complete and submit the financial "package" for GMAC's analysis. GMAC records indicated that it sent to Bates such a "package" of forms and instructions the following day (2 April 2009); Bates denied receiving it.

Later on April 1, Bates also called Cohn. Informing a Cohn employee that she was seeking a loan modification from GMAC, Bates inquired as to the status of the firm's case regarding her loan default. The employee told Bates that the date at which her property would be sold at foreclosure had not been set yet.

Subsequently, Cohn employed a private process server to serve Bates with the Order to Docket and accompanying documents, including a required consumer notice that "urged [her] to obtain legal advice to discuss other options to stop the foreclosure sale," like "filing a motion for injunction with the Circuit Court...." Moreover, the consumer notice made clear that such "[a] motion for injunction ... must be filed before the foreclosure sale occurs." Finally, the notice indicated that if Bates is "interested in selling [her] home to avoid a foreclosure sale, [she] may wish to contact a licensed real estate broker or salesperson as soon as possible."

After two unsuccessful attempts to serve Bates personally (on 9 and 10 April 2009) with these documents, the process server posted them on the front door of her home. On 14 April 2009, Cohn also sent the documents to Bates by certified mail, resulting in two additional, but unsuccessful, delivery attempts.

The next day, 15 April 2009, Bates called GMAC, stating that she had not received the financial "package" documents

---

**3.** HAMP applies to loans owned by Fannie Mae or Freddie Mac. Bates's loan was guaranteed by the Federal Housing Administration.

for loan modification consideration. GMAC informed her that she could download the necessary documents from GMAC's website. She did so, completed the forms, and mailed them to GMAC later that day.

Two weeks later, on 27 April 2009, Bates called GMAC to inquire about the "package," as she had not received a response. GMAC told her to re-submit the information to its "urgent loss mitigation" fax number, which she did. The re-submitted information indicated that, although Bates wanted to retain the property, she also had contacted a realtor to discuss listing the house for sale. She also stated that her monthly liabilities were $2,793.04 and her monthly income was $1,500.00.

Concerned that the foreclosure sale date may have been scheduled, Bates called a Cohn employee, on 6 May 2009, who told her that a sale date had not been scheduled yet. Bates then called a GMAC representative, posed the same question, and received the same response. She also told the GMAC representative that she had $10,000.00 in her bank account, assertedly enough to cover the outstanding default amount (per the 7 April 2009 Notice of Intent to Foreclose, one of the many documents accompanying the Order to Docket). She proposed to commit the money to satisfying the loan default and accrued costs only if her loan modification request was granted.[4]

After the GMAC representative transferred her to a GMAC loan counselor, Bates told the counselor that receiving a loan modification would give her more time to sell the house.

---

**4.** It is unclear on this record whether $10,000.00 actually would have been enough to bring Bates's account current at that point in time. The 16 January 2009 Notice of Intent to Foreclose states that the "[t]otal [a]mount [o]wed (to reinstate loan, as of the date of this letter) [is] $7,114.00." The Order to Docket included the same Notice of Intent, which reiterated that the "[t]otal [a]mount [o]wed (to reinstate loan, as of the date of this letter) [is] $7,114.00." The Order of Docket also included a Statement of Debt, however, which provided that the "[b]alance due as of January 1, 2009[is] $132,181.79." The latter figure suggests acceleration of the full mortgage debt then owed, plus accrued interest and possible costs.

Bates informed the counselor that her financial situation had changed, prompting the counselor to ask Bates for an updated financial package to analyze.

On the same day (6 May 2009), GMAC reviewed Bates's financial package (assumedly the one submitted on 27 April 2009), and denied her modification request because her monthly expenses exceeded her monthly income by $1,453.62. GMAC sent Bates a letter to that effect. Two days later, the foreclosure sale date was scheduled for 3 June 2009. On 13 May 2009, Cohn sent Bates a letter iterating that date. Despite these developments, GMAC also sent Bates a letter, on 18 May 2009, acknowledging Bates's inquiry (presumably referring to the new information relayed by Bates in her 6 May 2009 telephone conversation with the GMAC representative) as to her modification request. The letter stated that the updated financial information had not yet been received.

Two weeks passed before Bates faxed her further updated financial information. As soon as it was received, it was reviewed. The information revealed that Bates now had only $8,500.00 in her bank account, that her expenses-to-income ratio remained the same, that she wanted to keep her house, and that she had not listed the house for sale. As the substantive information had not changed for the better, on that same day, GMAC sent Bates another denial letter and left a voicemail message to like effect at her home telephone number.

On 3 June 2009, the property was sold at public auction, pursuant to the docketed foreclosure action, to 101 Geneva LLC ("Geneva"), a bona fide purchaser for value. After the sale, Bates sought counsel and filed exceptions to the sale, under Maryland Rule 14–305(d). Bates asserted in her exceptions that GMAC did not comply with the federal HUD/FHA pre-foreclosure loss mitigation requirements referred to in her deed of trust.[5] Because GMAC, it was plead, did not comply with these requirements, Bates posited that the "sale was

---

5. The deed of trust provides that the "[l]ender may, except as limited by regulations issued by the Secretary [of HUD] in the case of payment

[not] fairly and properly made," Md. Rule 14–305(e)(2), and the Circuit Court should set it aside.

GMAC responded that Bates waived her claim. It relied on our precedents for the proposition that once a sale has taken place, the debtor "may challenge only procedural irregularities at the sale...." *Greenbriar v. Brooks*, 387 Md. 683, 688, 878 A.2d 528, 531 (2005). Because Bates filed exceptions after the sale raising solely an issue that developed prior to the sale, rather than an injunctive action or collateral suit filed before the sale, GMAC contended that she was limited to asserting complaints regarding procedural irregularities associated with the conduct of the sale, which did not include GMAC's alleged failure to follow pre-sale loss mitigation efforts required by HUD.

On 20 August 2009, the Circuit Court conducted an evidentiary hearing on the exceptions, hearing testimony from Bates and her prospective realtor[6] and argument of counsel, and

---

defaults, require immediate payment in full of all sums secured by this Security Instrument...." Most of the pertinent regulations are encapsulated, discussed, or cross-referenced in 24 C.F.R. § 203.355 (2010), which is also known as the Loss Mitigation Program.

As the Secretary of HUD makes clear, in a letter explaining this program, "participation ... is *not* optional." HUD, Loss Mitigation Program—Comprehensive Clarification of Policy and Notice of Procedural Changes, Mortgagee Letter 00–05 (2000) (emphasis added). Indeed, "HUD ... measure[s] and advise[s] [lenders] of their loss mitigation performance," 24 C.F.R. § 203.605(b)(1), with unsatisfactory marks possibly "result[ing] in the loss of incentive compensation and other benefits," Mortgage Letter 00–05. Consequently, as soon as three monthly payments are due and unpaid, lenders are required to consider certain loss mitigation options, like a loan modification or pre-foreclosure sale. *See id.*

Aside from their active participation in the program, however, lenders are given great discretion regarding how loss mitigation efforts should proceed—"lenders must evaluate each defaulted loan and consider all loss mitigation techniques to determine which, *if any,* are appropriate (24 CFR 203.605)." *Id.* (emphasis added). Moreover, a lender's obligations are lifted "if a borrower fails to respond to repeated contacts," so long as the lender "clearly [made] aggressive efforts to reach [the defaulting] borrower ... well in advance of the 90 day deadline." *Id.*

**6.** The realtor that Bates contacted testified that he would have listed the home for sale for $325,000.00. The State Department of Assessments

thereafter taking the matter under advisement. On 2 September 2009, the trial judge issued an oral opinion, in which she denied the exceptions and ratified the sale. After reviewing reported cases, the judge found no support for the proposition that "this affirmative defense," involving pre-sale loss mitigation, "[may be raised] after the foreclosure at the ratification phase." [7] Moreover, with regard to any allowable post-sale claim of procedural irregularity in the sale itself, the Court found none.[8]

Bates appealed to the Court of Special Appeals. The Court of Appeals, on its initiative, issued a writ of certiorari before the intermediate appellate court decided the appeal. *Bates v. Cohn,* 414 Md. 330, 995 A.2d 296 (2010). The sole question framed by Appellant was: "[D]id [the] trial court err as a matter of law when it held that homeowner is precluded from raising a lender's substantive failure to satisfy loss mitigation requirements in the deed of trust as an exception to foreclosure sale?"

## II.

Before a foreclosure sale takes place, the defaulting borrower may file a motion to "stay the sale of the property and dismiss the foreclosure action." Md. Rule 14–211(a)(1). The borrower, in other words, may petition the court for injunctive

---

and Taxation, for real property tax assessment purposes as of 1 January 2009, claimed the fair market value of the property was $315,250.00. According to Bates's testimony she did not attempt to sell the house in the course of the events leading from late 2008 to the conduct of the foreclosure sale on 3 June 2009 because "who wants to sell their house in a recession, and be forced to ... lose money on their house...."

7. In her ruling, the trial judge stated that: "This defendant was on notice that the foreclosure sale was going to occur. She chose to ignore the notices, but she was served legally. She said she knew about it, but didn't pick up the mail. She wanted to wait [for] pending anticipated favorable legislation[, *i.e.,* HAMP]."

8. Bates's exceptions did not advance any challenge to the sale based on defects in the notice, advertising, or conduct of the sale, or the amount of the successful bid.

relief, challenging "the validity of the lien or ... the right of the [lender] to foreclose in the pending action." Md. Rule 14–211(a)(3)(B). In 2010, after the current controversy blossomed, this Court's Standing Committee on Rules of Practice and Procedure proposed, and we adopted, a series of notes accompanying revisions to Rule 14–211.[9] The first accompanies Rule 14–211(a)(3)(B) and states that "[t]he failure to grant *loss mitigation* ... in an action to foreclose a lien on owner-occupied residential property may be a defense to *the right of the [lender] to foreclose in the pending action.*" (Emphasis added.) The second Committee note attends Rule 14–211(b)(1)(C) and provides that "[a] motion based on the failure to grant *loss mitigation* in an action to foreclose a lien on owner-occupied residential property *must* be denied unless the motion sets forth good cause why loss mitigation pursuant to a loss mitigation program should have been granted...." (Emphasis added.) The third Committee note appends Rule 14–211(e) and makes another reference to loss mitigation, stating that a court "may stay entry of its order of dismissal ... so that *loss mitigation* may be implemented." (Emphasis added.)

Once the property is sold at foreclosure, the borrower may file a claim pursuant to Rule 14–305 only as to "exceptions to the *sale.*" (Emphasis added.) In doing so, he or she must "set forth the alleged irregularity with particularity...." Notwithstanding any exceptions:

---

9. In its 164th Report, the Rules Committee explained that the "notes ... proposed after subsections (a)(3), (b)(1)(C), and section (e) ... make clear that the failure to grant loss mitigation that should have been granted may constitute a *defense* to the action." (Emphasis added.) Moreover, in the Reporter's Note on Rule 14–211, the Committee states that "[t]he Rule allows this defense," regarding the failure to grant loss mitigation that should have been granted, "and all other grounds for *stay* of the sale and dismissal of the action to be included in a single motion." (Emphasis added.) Thus, the Rule intends that such claims, regarding loss mitigation, be brought as a *defense* to stay (or prevent) the sale before it occurs. In comparison, once a sale occurs, a homeowner no longer raises "defenses" that challenge the lender's right to foreclose; rather, he or she files "exceptions" to the sale itself. Rule 14–305.

> The court shall ratify the sale if (1) the time for filing exceptions pursuant to section (d) of this Rule has expired and exceptions to the report either were not filed or were filed but overruled, and (2) the court is satisfied that the sale was fairly and properly made. If the court is not satisfied that the sale was fairly and properly made, it may enter any order that it deems appropriate.

Md. Rule 14–305(e).

In the last several years (to no one's great surprise, in view of the downturns in the national and local economies, and particularly rising unemployment and descending property values), we and the Court of Special Appeals have had occasion to apply these provisions (or their direct lineal predecessors) in a number of reported cases. In *Greenbriar*, "we determine[d] ... the point at which an objector to a foreclosure sale based upon the lien arising from a default in the payment of a condominium fee or assessment must formally make known his objections...." 387 Md. at 687, 878 A.2d at 530. After the foreclosure sale in *Greenbriar*, the defaulting condominium owner sought emergency injunctive relief under former Md. Rule 14–209 (the precursor to Rule 14–211), claiming that he tried to bring his account current, but the lender refused improperly to accept his tender of payment. *See Greenbriar*, 387 Md. at 737, 878 A.2d at 561.

We held that "prior to the sale, the debtor may seek to enjoin the foreclosure sale from proceeding by filing a motion to enjoin as provided in [Md.] Rule 14–209." *Greenbriar*, 387 Md. at 688, 878 A.2d at 530. "Should a sale occur," we cautioned, "the debtor's later filing of exceptions to the sale may challenge *only* procedural irregularities at the sale or ... the statement of indebtedness...." *Id.* (emphasis added). In so doing, Judge Cathell, writing for the Court, explained that:

> Generally, injunctions are to be filed prior to the action which they seek to forestall. The timing of this remedy is not elective. Were a post-sale injunction retroactively overturning a sale permitted, such a remedy would not only be

counter to the logic and nature of injunctions, but would give rise to conflicts among the interested parties. The debtor might seek another bite at the apple, or some other junior lien holder might enjoin only if the sale fetched a price insufficient to satisfy his debt.

The equities cannot be maintained—and are not intended to be maintained—*after* the foreclosure sale by any method other than the filing of exceptions. The nature of the exceptions may be to request that the Circuit Court take action relative to an audit that has been duly stated or even to set aside the sale due to irregularities in the sale process itself—but not to upset retroactively a sale properly held. Challenges, by means of filing exceptions to the foreclosure sale are generally promulgated in two manners after the sale: first, exceptions filed prior to the Circuit Court's ratification of the sale generally assert procedural irregularities in the sale itself. These might include allegations such as the advertisement of sale was insufficient or misdescribed the property, the creditor committed a fraud by preventing someone from bidding or by chilling the bidding, challenging the price as unconscionable, etc. Alternatively, or in addition, challenges to the creditor's exact statement of debt are generally submitted by filing exceptions to the post-ratification auditor's report.

*Greenbriar*, 387 Md. at 740–41, 878 A.2d at 563. The condominium owner's obligation, we concluded, "was to prosecute his rights, not to sit on them." *Greenbriar*, 387 Md. at 740, 878 A.2d at 563.

Two years after *Greenbriar*, we considered former Rule 14–209 in *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 922 A.2d 538 (2007). The relevant facts of *Wells Fargo* are similar to the case at hand in at least one significant way—a homeowner claimed that his lender failed to follow federal loss mitigation requirements, as provided for in his deed of trust. *Wells Fargo*, 398 Md. at 710–11, 922 A.2d at 541. Unlike the case at bar, however, the homeowner in *Wells Fargo* claimed, *pre-sale*, that (1) the lender breached their contract, and (2) he was entitled to declaratory, or injunctive, relief. The question

was whether he could advance, "as an affirmative cause of action, a State law [breach of] contract claim...." *Wells Fargo*, 398 Md. at 711, 922 A.2d at 541. In holding that such a claim is precluded, we ruled that the homeowner may raise, however, "a violation of the regulations in pursuit of an injunction *blocking foreclosure.*" *Id.* (emphasis added).

The following year, the Court of Special Appeals confronted a related matter. In *Jones v. Rosenberg*, 178 Md.App. 54, 940 A.2d 1109 (2008), the loan on a home, co-owned by two people, went into default, and the home was sold ultimately at foreclosure. In an effort first to stop the sale and later to set it aside, the homeowners filed pre- and post-sale motions. Noting that "[t]here is a presumption in favor of the validity of a judicial sale," the intermediate appellate court reaffirmed that "[a ]fter a foreclosure sale ... a debtor may file exceptions challenging *only* procedural irregularities in the foreclosure sale." *Jones*, 178 Md.App. at 69, 940 A.2d at 1117 (emphasis added) (citations omitted).

In their post-sale filing of exceptions, the homeowners in *Jones* alleged that an "opportunity to cure the default" was lacking, "the deed of trust violated federal mortgage laws," the debt owed was covered by a surety bond "submitted ... to the clerk of the circuit court," and due process was denied. *Jones*, 178 Md.App. at 61, 940 A.2d at 1113. Moreover, they claimed that there was a "lack of notice of the foreclosure sale by registered mail...." *Id.* Relying on our *Greenbriar* opinion, the intermediate appellate court rejected all of these claims, save the last, and that only because it went to the procedural regularity of the sale. *Jones*, 178 Md.App. at 70–71, 940 A.2d at 1118.

In 2010, the Court of Special Appeals decided *Bierman v. Hunter*, 190 Md.App. 250, 988 A.2d 530 (2010). After a residential property was sold at foreclosure, the homeowner/borrower filed exceptions, alleging that the loan was the product of a forged signature. *See Bierman*, 190 Md.App. at 254, 988 A.2d at 533. The lender argued that such a claim—sounding in fraud—challenges its substantive right to sell and,

thus, under *Greenbriar*, should have been asserted before the sale occurred. *See Bierman*, 190 Md.App. at 259, 988 A.2d at 535. Disagreeing with the lender, the intermediate appellate court deemed the homeowner's claim contending that her signature was forged as challenging effectively the underlying validity of the mortgage. *See Bierman*, 190 Md.App. at 268–69, 988 A.2d at 541–42. It held that such a challenge, under *Albert v. Hamilton*, 76 Md. 304, 25 A. 341 (1892) and *Wilson Brothers v. Cooey*, 251 Md. 350, 247 A.2d 395 (1968), may be raised properly by post-sale exceptions. *See id.* In the process, the Court of Special Appeals distinguished *Greenbriar* and *Jones*, observing that:

> Unlike the instant case, neither *Greenbriar* nor *Jones* addressed a situation where the ... exception to the foreclosure sale attacked the underlying validity of the mortgage. *Greenbriar* set forth the appropriate procedure to forestall a foreclosure sale where the debtor admitted liability but disputed the amount claimed by the creditor.

*Id.* (citation omitted). Thus, according to the intermediate appellate court, our *Greenbriar* "holding ... [was] a narrow one, focusing on the debtor's right of redemption when there is a dispute over the sum due and it is conceded that some sum is due and in default." *Bierman*, 190 Md.App. at 266, 988 A.2d at 540.

The panel of our appellate colleagues continued:

> In *Jones*, the appellants' complaint in federal court, which alleged that the deed of trust violated federal mortgage laws, never asserted that such alleged violations rendered the deed of trust invalid. Indeed, in the complaint in federal court appellants sought only monetary damages as relief for the alleged violations of federal mortgage laws. Additionally, appellants' fraud allegation, which was also based on alleged violations of federal mortgage laws, was raised in the context of a motion to alter or amend the judgment ratifying the foreclosure sale under Rule 2–535, not as an exception to the foreclosure sale.

*Bierman,* 190 Md.App. at 269, 988 A.2d at 542 (internal citations omitted).

■ In conclusion, the intermediate appellate court expounded that:

> Most importantly, neither *Greenbriar* nor *Jones* referenced, and thus did not overrule or reject, the line of cases discussed above, [including *Albert* and *Wilson Brothers* ], that permit a mortgagor to challenge the underlying validity of a mortgage by filing exceptions to foreclosure sale pursuant to Rule 14–305. *Accordingly, those cases remain good law.*[10]

*Id.* (emphasis added).

### III.

Against this legal backdrop, we return to the present case. Bates claims sweepingly that equity courts have "broad authority" and "full power under Rule 14–305(e) to hear and determine all objections to the foreclosure sale." Bates relies heavily upon *Bierman. See Bierman,* 190 Md.App. at 264, 988 A.2d at 539 (citing *Albert* and *Wilson Brothers* ). Because, allegedly, GMAC did not abide the federal loss mitigation requirements, Bates claims the sale was neither fair nor proper and, thus, should have been set aside. This argument fails for at least two reasons.

First, unlike the mortgagors in *Albert, Wilson Brothers,* and *Bierman,* Bates is not claiming that her deed of trust was the product of fraud, and, thus, title was incapable of passing

---

**10.** As we said in *Greenbriar,* an allegation of fraud, with respect to the procedure of the sale, may be asserted properly in a post-sale exception. *See Greenbriar,* 387 Md. at 741, 878 A.2d at 563. Whether an allegation of fraud regarding the underlying mortgage or deed of trust likewise may be raised post-sale, however, is a related, but distinct, question. Notwithstanding *Bierman,* we have not yet addressed such a question under the more restrictive version of Rule 14–305. *See infra* our discussion on *Albert, Wilson Brothers,* and *Bierman; c.f.* Md. Rule 14–211(a)(3)(B) (stating explicitly that, to stay a sale (rather than set it aside), a homeowner/borrower may challenge, *pre-sale,* "the validity of the lien. . . ."). The parties' arguments in the present case do not require us to do so here. Fraud is not one of Bates's contentions.

through the foreclosure proceeding. Nor does she assert that GMAC actively encouraged her to sit on her rights and await the outcome of loss mitigation or loan modification efforts that would never come to pass, such that the sale was the product of a silent fraud and title *should not* pass. Rather, she contends plainly and only that GMAC failed to comply with HUD loss mitigation efforts implicitly invoked in her deed of trust, which rendered the sale "not fairly and properly made," *i.e.*, invalid. The latter is a distinct argument, quite apart from fraud.[11]

Second, *Albert* and *Wilson Brothers* do not support the inference that the present rule, 14–305, grants courts *"full* power to hear and determine *all* objections to [a] foreclosure sale . . . ." (emphasis added). Those cases turn on interpretations of older, different, and more latitudinous versions of predecessors to Rule 14–305. In particular, when we decided *Albert* a hundred years ago, the governing law was Maryland Code Article 66, § 9, codified in 1888, which stated that courts "shall have full power to hear and determine *any* objections which may be filed against the sale." (Emphasis added.) Based on the breadth of this language, we concluded that, for a mortgagor, "the statute has preserved . . . [an] unquestionable right" to challenge the validity of the mortgage, "not merely . . . the regularity of the mode in which the sale was conducted." *Albert*, 76 Md. at 308, 25 A. at 342.

Seventy years later, we encountered again a foreclosure sale challenge in *Wilson Brothers*, based on the notion that the underlying mortgage was fraudulent and invalid. By this time, Article 66, § 9 had been supplanted, in large part, by

---

11. The following exchange took place at oral argument, before this Court:

Court: "Did you allege that this amounted to fraud, on the part of GMAC, to induce her not to file [for injunctive relief]?"

Appellant's Counsel: "No your Honor, I think it's more of an estoppel or a reliance to her detriment."

Court: "Did you ask the trial judge to find estoppel?"

Appellant's Counsel: "No your Honor . . . ."

Rule BR6. The successor rule, entitled "Procedure Following Sale," provided that:

> A final order of ratification of a sale shall be passed by the court after the time for responding to any order issued pursuant to subsection 2 of this section has expired, if the court is satisfied that the *sale was fairly and properly made,* and exceptions are not filed to the report of sale, or if exceptions are filed but overruled.

(Emphasis added.) The variant language notwithstanding, we held that "the scope of the [post-sale] hearing ha[d] not been narrowed...." *Wilson Bros.,* 251 Md. at 360, 247 A.2d at 401.

Today (and at the operative times in Bates's case), Rule BR6 has been supplanted. The present rule, 14–305, states, similar to its immediate predecessor, that:

> The court shall ratify the sale if (1) the time for filing exceptions pursuant to section (d) of this Rule has expired and exceptions to the report either were not filed or were filed but overruled, and (2) the court is satisfied that the *sale was fairly and properly made.*

Rule 14–305(e) (emphasis added). The rule added an important restriction, however. Exceptions are now to "set forth the alleged *irregularity* with particularity...." Rule 14–305(d)(1) (emphasis added).

In examining this rule-making and jurisprudential evolution, a few notables stand out. Originally, the Legislature, in Article 66, § 9, determined that equity courts enjoyed unbridled power to hear "any" exception to the sale. Some years later, we weighed in on the topic, adopting our rule—BR6. Although we opined, thereafter, that the scope of review remained the same under BR6 as was the case under Article 66, § 9, *Wilson,* 251 Md. at 360, 247 A.2d at 401, Rule BR6 provided equity courts with added guidance—they were now required to consider whether a "sale was fairly and properly made...." Presently, under Rule 14–305, we limit also the scope of review to exceptions alleging "irregularity," which, as we clarified later, permits only those challenges to "procedural irregularities at the sale or ... the statement of indebtedness...." *Greenbriar,* 387 Md. at 688, 878 A.2d at 530.

Thus, to say 14–305 is as expansive as Article 66, § 9 and Rule BR6 would be a mis-statement.[12]

 We reaffirm the conclusion in *Greenbriar* that Rule 14–305 is not an open portal through which any and all pre-sale objections may be filed as exceptions, without regard to the nature of the objection or when the operative basis underlying the objection arose and was known to the borrow-er. As we stated in *Greenbriar*, after a foreclosure sale, "the debtor's later filing of exceptions ... may challenge only procedural irregularities at the sale or ... the statement of indebtedness." *Id.* Such procedural allegations may charge that "the advertisement of sale was insufficient or misdes-cribed the property, the creditor committed a fraud by pre-venting someone from bidding or by chilling the bidding, challenging the price as unconscionable, etc." *Id.* To the extent that *Bierman* may be perceived as attempting to confine our *Greenbriar* holding to its particular circumstances, *i.e.*, where there is a "sum due and it is conceded that some sum is due and in default," *Bierman*, 190 Md.App. at 266, 988 A.2d at 540, we hold that such a view would be misguided. *Greenbriar* was meant to be (and is) an explanation of the proper and general framework, structured in Rules 14–211 and 14–305, that a homeowner/borrower must follow when he or she seeks to raise pre- and/or post-sale objections in a foreclosure proceeding. *Greenbriar*, 387 Md. at 688, 878 A.2d at 531.[13] We do not rule here on whether a homeowner may

---

12. The history behind Rule 14–305's supplanting of BR6 supports the conclusion that Rule 14–305 was meant to give equity courts' post-sale inquiries greater structure and focus. Although the Reporter's Note to Rule 14–305 explains that "[t]his Rule incorporates the substance of BR6 with style changes," it makes clear that Section (d), in particular, is "new." According to the Committee Chairman, BR6 detailed when, but not "how ... exceptions were to be filed." Rules Committee, Minutes of March 15 Meeting (1996). Rule 14–305(d) answered that question. *See id.* More specifically, the "purpose of the proposed new section [ (d) ] is not to encourage the filing of exceptions, but to allow them *if the validity of the sale can be challenged." Id.* (emphasis added).

13. In *Bierman*, the Court of Special Appeals recognized initially that *Greenbriar* was our exposition on the rule-based framework guiding

raise under 14–305, as a post-sale exception, allegations that a deed of trust was the product of fraud, and, therefore, the sale was invalid and *incapable* of passing title. Nor do we determine whether a homeowner/borrower may assert under 14–305, as a post-sale exception, claims that a foreclosure sale was the product of the lender affirmatively and purposefully misleading the borrower in default that ultimately unsuccessful pre-sale loss mitigation or loan modification efforts would likely be successful (or protracting strategically the denial of those efforts) and therefore dissuading the borrower from seeking to assert pre-sale defenses in a timely manner.

■ We hold only that, given the limitations of Rule 14–305 and our *Greenbriar* and *Wells Fargo* opinions, a homeowner/borrower ordinarily must assert known and ripe defenses to the conduct of a foreclosure sale prior to the sale, rather than in post-sale exceptions. A lender's failure to comply with pre-sale loss mitigation requests is one such defense, which must be raised ordinarily pre-sale in an effort to prevent the sale from occurring.[14] In so concluding, we find instructive not only Rule 14–305 and *Greenbriar*, but also the Committee notes to Rule 14–211 and *Wells Fargo*.

■ Rule 14–211 allows homeowners to prevent a foreclosure sale by challenging, among other things, the "right of the

---

challenges to foreclosure sales. *See Bierman,* 190 Md.App. at 264–65, 988 A.2d at 539 ("The Court of Appeals granted *certiorari* to address, *inter alia,* "[a]t what point [ ] the debtor [must] formally file his objections to the holding of a foreclosure sale[.]" " (quoting *Greenbriar,* 387 Md. at 688, 878 A.2d at 531)). Moreover, it perceived correctly that, after outlining the framework, we applied it "in the context of the [condominium owner's] argument" to divine a resolution. *Bierman,* 190 Md.App. at 265, 988 A.2d at 539; *see id.* ("Later on in the [*Greenbriar* ] opinion, however, the Court of Appeals explained its holding in the context of the appellant's argument. . . ."). By first outlining the framework and then applying it to the context at hand, however, we did not mean to limit entirely the framework's prospective relevance.

**14.** Thus, we do not reach the merits of Bates's claim that GMAC failed to comply with loss mitigation requirements. Had we needed to confront that claim on its merits, we would have remanded the matter to the trial court for fact-finding, as mentioned *supra.*

[lender] to foreclose...." Md. Rule 14–211(a)(3)(B). The Committee notes raised the issue of loss mitigation three times. It did so by stating that the failure to grant loss mitigation "may be a defense to the *right* of the [lender] *to foreclose* in the pending action." 2010 Committee Note to Rule 14–211(a)(3)(B) (emphasis added). A reasonable construction of this language (and its placement within Rule 14–211) indicates that a lender's failure to comply with loss mitigation requirements goes to its *right* to foreclose, rather than its procedural handling of the sale. As a result, a homeowner, who wishes to use the lender's failure as the basis of his or her claim, must do so through Rule 14–211's pre-sale injunctive relief apparatus.

A reasonable reading of *Wells Fargo* confirms this determination. We held in *Wells Fargo* that a "mortgagor ... may not advance, as an affirmative cause of action, a State law contract claim based on asserted breach of the HUD [loss mitigation] regulations alluded to in his FHA form deed of trust, but may raise a violation of the regulations *in pursuit of an injunction blocking foreclosure.*" *Wells Fargo*, 398 Md. at 711, 922 A.2d at 541 (emphasis added). Thus, we recognized that such a claim is immediately ripe, and, accordingly, should be raised pre-sale in hopes of *blocking* foreclosure *before* it occurs.

Bates anchors her appeal in the venerated history of the traditional power of equity courts to right injustices. She overlooks, however, that the Maryland Rules—a product of the Court—may bridle the extent of the exercise of that power. This is such a case, where the court's equity power is only as indefinite as the Maryland Rules allow. If it were otherwise, the proper "equities," in the context of a foreclosure sale, "[could and would not] be maintained." *Greenbriar*, 387 Md. at 741, 878 A.2d at 563.

Although we acknowledge that the spectre of foreclosure is as daunting as it is disheartening, if a borrower was able to raise any sort of exception after the foreclosure sale, there undoubtedly would be a chilling effect on interested prospec-

tive purchasers coming to sales. Prospective third-party purchasers would be unable—based on most practical notions of what constitutes due diligence—to gauge against such claims the risk of an intended investment. Being a bona fide purchaser for value then would not mean as much or even offer the traditional safe harbor underlying that status.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**